Filed 2/23/24  P. v. Torres CA6

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>SAMANTHA JENNIFER TORRES,<br><br>　　Defendant and Appellant. | H048742<br>(Santa Clara County<br>Super. Ct. No. C1900581)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING**<br><br>**NO CHANGE IN JUDGMENT** |

Defendant Samantha Jennifer Torres's petition for rehearing is denied as moot. There is no change in the judgment. The court orders that the opinion filed January 24, 2024, be modified as follows.

On page 13, the second full paragraph, immediately preceding the heading "b. *Burgos*", should be deleted and replaced with the following paragraph:

> We therefore conclude that section 1050, subdivision (g) permits multiple continuances in cases such as this one involving child abuse.  In light of this conclusion, we also reject Torres' argument that the trial court violated her statutory speedy trial rights under section 1382.  As Torres acknowledges, the " 'good cause' " showing required for a continuance under section 1050 "mirrors" the "good cause" showing required for an exception to the 60-day speedy trial deadline under subdivision (a) of section 1382.  (See *Burgos v. Superior Court, supra*, 206 Cal.App.4th at pp. 826-827.)  Accordingly, the trial court's findings of good cause under section 1050 likewise satisfied the good cause exception to the speedy trial deadline under section 1382, subdivision (a).

On page 24, in the first full paragraph, the sentence "But she did not present any of this evidence in objecting to the delay in her trial, and the prosecution had no chance to

present responsive evidence on this issue." shall be deleted and replaced with the

following sentence:

> But in objecting to the delay in her trial, she presented only cursory evidence that the delay was adversely affecting her mental state, and the prosecution was not given adequate notice that it should present responsive evidence on this issue.


_____

Bromberg, J.


_____          _____

Greenwood, P.J.                                   Grover, J.

Filed 1/24/24  P. v. Torres CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAMANTHA JENNIFER TORRES,<br><br>    Defendant and Appellant. | H048742<br>(Santa Clara County<br>Super. Ct. No. C1900581) |

In January 2016, Samantha Torres's nearly three-year-old son Apollo was sexually abused and killed.  Torres's boyfriend Manuel Lopez was charged with murdering Apollo, and later Torres was charged with felony child abuse, being an accessory after the fact to Apollo's murder, and committing perjury in the proceedings against Lopez.  Although Lopez was eventually acquitted, Torres was found guilty of the child abuse, accessory, and perjury charges.

Torres challenges her convictions on three grounds.  She argues that the trial court violated her right to a speedy trial by granting multiple continuances while the prosecutor trying her case completed Lopez's murder trial.  She also argues that the trial court erred in not giving unanimity instructions on the child abuse and accessory charges.  Finally, she argues that her trial counsel rendered ineffective assistance of counsel by not

requesting an instruction concerning the statute of limitations. As explained below, we reject each of these arguments.

Torres also challenges her sentence on several grounds. As the Attorney General concedes, several of these challenges have merit. In particular, Torres is entitled to a reduction in the length of probation on the accessory and perjury charges, and the probation supervision fee should be vacated. In addition, as Torres points out, the abstract of judgment does not reflect the trial court's oral pronouncement. However, contrary to Torres' contention, we conclude that the trial court intended to suspend execution, not imposition, of her prison sentences.

Accordingly, we modify the judgment to reduce the terms of probation on the accessory and perjury counts, to vacate any unpaid supervision fee, and to modify the abstract of judgment to state that only execution of sentence is suspended. As thus modified, the judgment is affirmed.[1]

## I. Factual and Procedural Background

A.      *Apollo's Death*

Apollo Lopez was born in March 2013. On the morning of January 16, 2016, a paramedic responded to an emergency call and found Apollo not breathing and with no pulse. Apollo was ashen, and both rigor mortis and lividity (blood settling in the body) already had set in. After an ambulance transported him to a hospital, Apollo was pronounced dead.

The paramedic testified that Apollo's face was bruised on both sides, and a nurse who examined him at the hospital testified that there was blood in both ear drums, dried blood and feces on both legs and hands, "torn skin on the child's penis," and "bloody rectal trauma."

---

[1] Torres also filed a petition for a writ of habeas corpus (case number H051187), which we ordered considered with this appeal. By separate order, we deny that petition.

2

Three days later, the medical examiner's office performed an autopsy. The pathologist who performed the autopsy testified that he had "never had a case of a child with so many injuries" or, indeed, any case "with this constellation of extensive injuries." The pathologist found nearly two dozen scars from injuries sustained weeks or months before as well as a skull fracture that had just begun to heal and therefore appeared to have occurred two days or so before death. In addition, the pathologist found over 80 recent or "acute" injuries, including 48 contusions, 24 abrasions, and 10 lacerations. These acute injuries included nearly three dozen lacerations, contusions, and abrasions to Apollo's genitals; two dozen injuries to the anus, rectum, and a related area; and injuries to his neck, diaphragm, eyes, and brain indicative of asphyxiation.

The pathologist concluded that the injuries to Apollo's genitals, anus, and rectum were consistent with recent sexual assault and rape. He concluded, however, that the cause of death was "homicidal violence," and although the exact mechanism of death was unknown, he said that the evidence pointed toward an "asphyxial event," meaning Apollo may have been smothered or choked.

B. *Lopez's Murder Prosecution*

The police found sperm from Manuel Lopez, Torres's boyfriend with whom she had a son in August 2015, in rectal and penile swabs from Apollo as well as on Apollo's clothing, including a pajama top. On January 26, 2016, 10 days after Apollo's death, Manuel Lopez was charged with murdering Apollo.

The trial in Lopez's case appears to have begun in October 2019. Although the trial was initially expected to be completed in April 2020, due to the COVID-19 pandemic, it was not completed until July 2020. The jury acquitted Lopez of all charges.

C. *Torres' Case*

1. The Charges

On January 10, 2019, nearly three years after Apollo's death while Lopez's trial was in progress, the People filed a criminal complaint against Torres charging her with

3

three offenses: (1) felony child abuse, (2) harboring, concealing, or aiding Lopez in Apollo's murder (accessory to murder), and (3) perjury. On August 14, 2019, the Santa Clara County District Attorney filed an information charging Torres with the same offenses.

### 2. The Delay in Reaching Trial

Torres' trial was delayed until July 2020. Although originally set for October 7, 2019, the trial was initially continued to October 18, the last day for trial under Penal Code section 1382.[2] Shortly before that date, the prosecution moved for a continuance because the prosecutor assigned to the case was involved in the Lopez murder trial, which was then in progress. Over Torres' objection, the trial court granted a continuance under section 1050 of 10 days, the maximum authorized by the section. On November 1, the prosecution requested a second 10-day continuance under section 1050 based on the assigned prosecutor's involvement in the Lopez trial, which the trial court again granted over Torres's objection.

Torres subsequently moved to dismiss, arguing that the prosecution could not seek multiple continuances under section 1050 and, in any event, multiple continuances would violate her state and federal constitutional rights to a speedy trial. Relying on *Burgos v. Superior Court* (2012) 206 Cal.App.4th 817, the trial court ruled that section 1050 permits multiple continuances in cases such as Torres' and rejected her constitutional challenges.

Between December 2019 and March 2020, the trial court granted eight additional continuances under section 1050. Torres also filed a writ petition challenging the continuances, which this court summarily denied. (*Torres v. Superior Court* (Mar. 24, 2020, H047956).) Subsequently, in light of emergency orders concerning the COVID-19

---

[2] Subsequent undesignated statutory references are to the Penal Code.

4

pandemic, trial was continued several more times, and additional continuances under section 1050 were granted as well.

As a result, the trial court did not begin to hear motions in limine for Torres's trial until July 22, 2020, and jury selection did not begin until August 12, 2020.

### 3. The Evidence Presented at Trial

At trial, the prosecution presented evidence that Apollo suffered repeated injuries for months preceding his death, but Torres concealed that he was being abused by Lopez and continued to protect Lopez even after Lopez was arrested and charged with murdering Apollo.

### a. Apollo's Injuries

In February 2015, shortly after Torres became pregnant with Apollo's younger brother, Lopez moved into the home that Torres shared with Apollo, his older sister, and Torres's brother. Two months later, Apollo began to suffer a series of disturbing injuries.

In May 2015, during a routine wellness check, Apollo's primary care physician noted a bruise and a laceration on Apollo's penis. Twelve days later, Torres brought Apollo to the emergency room for a bleeding abrasion to the foreskin of his penis. In addition, around this time, Apollo's left femur was fractured. This sort of fracture is uncommon, and often the result of child abuse, because significant force is required to break the femur. A broken femur is also usually quite painful and difficult to walk on. There is no record, however, that Apollo was ever treated for this fracture.

In July 2015, Apollo suffered fractures in both his elbows. On July 2, 2015, Torres took Apollo to the emergency room for an injury to his right arm. The following day, Apollo returned to the hospital, this time with an injury to his left arm. Because the physician who treated Apollo on July 2 had not found any injury to his left arm, Apollo was given a "battered child" series of x-rays to look for additional fractures. These x-rays showed the earlier fracture to Apollo's femur.

5

As noted above, the pathologist who performed Apollo's autopsy also found evidence of a skull fracture two days or so before Apollo's death. In addition, the pathologist found over 20 scars from injuries weeks or months before.

Apollo suffered numerous smaller injuries in the months preceding his death. Starting in 2014, Apollo stayed with Cindy Reynolds, his paternal grandmother, almost every weekend. After Lopez moved into Torres's home in early 2015, Reynolds began noticing injuries such as broken blood vessels in Apollo's eyes, scrapes on his legs, and cuts on his tongue. One time Apollo even had what "appeared to be a cigarette burn on his chin."

Others also noticed injuries. Justin Reynolds, Cindy Reynolds' son and Apollo's father, saw burst blood vessels in Apollo's eyes and a burn mark on his penis. Regie Palmer, who often helped Cindy Reynolds care for Apollo and frequently gave him baths on the weekend, saw bruises on Apollo's arms, wrist, forehead, lip, chin, knee, and legs. In addition, one time Palmer saw that Apollo had burns on his wrist that were "two perfectly cylindrical shapes like a cigarette."

Erica Ransom, whose daughter often played with Apollo's older sister, also noticed that Apollo had bloodshot eyes. In addition, on the day before Apollo died, Torres texted Ransom to ask "how [to] treat a hematoma."

b.      Concealment of Apollo's Injuries

Based on Apollo's many injuries, both Cindy Reynolds and Regie Palmer were concerned that someone might be abusing Apollo, but Torres deflected such concerns by offering innocent (though often contradictory) explanations for Apollo's injuries to them and to others.

In particular, Torres attributed many of Apollo's injuries to accidents. For example, she told Cindy Reynolds that Apollo broke his elbows at the playground and later said that he slipped while running on a wet kitchen floor. Torres similarly told Justin Reynolds that Apollo had fallen from a jungle gym. In July, when she took Apollo

6

to the emergency room, she told the treating physician that Apollo probably had injured his elbows when he fell backwards while chasing his older sister. The hospital's child abuse experts found this explanation plausible and decided not to report them to Child Protective Services (though they were later fired for that decision).

Torres also offered multiple explanations for Apollo's bloodshot eyes. She told Cindy Reynolds that Apollo hurt his eyes one time when he ran into a metal object on the playground. Another time she told Ransom that Apollo's eyes were bloodshot because he had fallen on his face, an explanation that did not makes sense to Ransom because Apollo had no marks or abrasions on his face.

Torres attributed other injuries to Apollo falling and playing with his older sister. And in May 2015, when Apollo's primary care physician found injuries to his penis, Torres said that Apollo had fallen down, and she attributed the hemorrhage in his eye to excessive crying. She told another doctor that a bruise on Apollo's forehead was from jumping on a couch and falling. And she explained away the burns on Apollo's penis that Justin Reynolds noted by saying that someone accidently had dropped a lighter.

### c. Concealment of Evidence

Torres also concealed evidence after Apollo died. Especially in light of the lacerations to Apollo's anus, the pathologist expected bleeding from the injuries suffered on the day of the murder. However, the paramedic who arrived at Torres' home did not find Apollo covered in blood. Instead, the paramedic found him lying naked on a blanket, with only blood in his ear drums and dried blood on his legs and hands. When the police interviewed Torres later that day, she told them that she had taken off Apollo's clothes and given him a shower in attempting to revive him.

Evidence also indicated that someone had attempted to wash the clothes worn by Apollo and then thrown them out. When Torres went to bed the night before his death, he was wearing a Toy Story t-shirt and brown shorts. By the time the paramedics arrived the next morning, both had been removed and were not in the house. Instead, the police

7

found them, along with other clothing, in a trash can outside the house. From the staining patterns on the clothes, it appeared that someone had attempted to clean the clothes. Nonetheless, DNA analysis conducted on the clothing and the t-shirt in particular showed blood from Apollo and sperm from Lopez.

### d. Statements to Investigators

After Apollo's death, when the police asked Torres about the bruises on his face, she replied said that Apollo was "accident prone" and the bruise had come from an accident on his bike. She also told the police that Apollo had a tendency to bite himself, he pinched his penis, and he sometimes "pooped a little bit of blood" because he pushed too hard.

Torres also denied that either she or Lopez ever hit Apollo. In fact, even after being told that Lopez' semen had been found on Apollo, Torres continued to deny that Lopez hit Apollo or did anything suspicious.

### e. Testimony at the Preliminary Examination

At Lopez's preliminary examination, Torres testified that Lopez had a good relationship with Apollo. She said that Lopez never hit Apollo and was with her the entire night of January 15, the night before Apollo was found dead. She also said that, when they discovered Apollo the next morning, there was no blood, and Lopez tried to give him CPR. Finally, Torres said it was her idea to try to wake up Apollo by putting water on him and in particular on his genitals.

Torres also continued to blame Apollo for his injuries. She testified that Apollo was "clumsy" and injury prone. She said that in May 2015 Apollo hurt his penis when a toilet seat fell on it, Apollo broke his arms in July 2015 when he fell running into the kitchen, and in January 2016 Apollo hurt his face and his groin when he fell off a bike.

Although Torres admitted that Apollo had bruising around his genitals as a result of the last incident, she testified that she decided not to go to the doctor because she was afraid that they would suspect child abuse.

8

### 4. Verdict

The prosecutor argued that Torres was guilty of child abuse because she concealed Lopez's abuse of Apollo and prevented others from protecting Apollo by providing innocent explanations for Apollo's injuries. The prosecutor also argued that Torres was an accessory after the fact to Apollo's murder because she sought to conceal Lopez's guilt by destroying physical evidence, by giving the police innocent explanations for Apollo's injuries, and by providing false testimony under oath at Lopez' his preliminary examination. Finally, the prosecutor argued that Torres committed perjury by providing that false testimony.

The jury convicted Torres on all three counts.

### 5. Sentencing

The trial court sentenced Torres on November 2, 2020. The court sentenced her to "seven years and eight months" in prison, but then suspended the sentence and granted formal probation for five years. The court stated that "[t]he imposition of sentence is suspended," but then, somewhat contradictorily, explained that "[i]t would be the Court's intention to make sure that there is enough balance of a suspended state prison sentence that if Ms. Torres does not comply with the terms and conditions of her probation, that she will go to state prison." The abstract of judgment indicated that both the execution and the imposition of sentence were suspended.

### 6. The Appeal

On December 10, 2020, Torres filed a timely notice of appeal.

## II. Discussion

### A. *Speedy Trial*

Although Torres was arrested in January 2019 and arraigned in August 2019, her trial did not begin until July 2020. Torres argues that this delay violated her statutory and constitutional rights to a speedy trial. We disagree.

1.     Section 1050

The trial court granted 18 successive continuances under subdivision (g) of section 1050 because the prosecutor assigned to this case was involved in the murder trial of Manuel Lopez then in progress.  Torres argues that the trial court violated subdivision (g) in granting these continuances because the subdivision permits only one continuance per case.  However, the plain language of subdivision (g), the leading case construing it, and the legislative history all show that multiple continuances are allowed in cases such as this one involving child abuse.

a.     The Text of Section 1050

While subdivision (g) of section 1050 expressly prohibits multiple continuances in cases involving some types of offenses, child abuse is not one of those offenses, and the subdivision is therefore naturally read to permit multiple continuances in cases such as this one involving child abuse.

In interpreting statutes, our primary objective is to " 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' " (*Carmack v. Reynolds* (2017) 2 Cal.5th 844, 849, quoting *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)  To determine that intent, "[w]e look first to ' "the language of the statute, affording the words their ordinary and usual meaning and viewing them in their statutory context." ' " (*People v. Jimenez* (2020) 9 Cal.5th 53, 61.)  In addition, " '[w]e do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.' " (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 (*Bruns*).)  Indeed, in interpreting particular provisions in a statute, "it is a cardinal rule that the entire substance of the statute or that portion under review should be examined . . . ." (*West Pico Furniture Co. v. Pacific Finance Loans* (1970) 2 Cal.3d 594, 608.)  Finally, if after applying these tools, a statute's meaning remains unclear, " 'courts may consider other aids,' " such as legislative history.  (*Bruns*, *supra*, 51 Cal.5th at p. 724.)

10

Here, the plain language of subdivision (g)(2) of section 1050, read in light of the following subdivision (g)(3), plainly indicates that subdivision (g) permits multiple continuances in some cases.  Subdivision (g)(2) provides that there is " 'good cause' " for a continuance in "cases involving" six types of offenses if "the prosecuting attorney assigned to the case has another trial, preliminary hearing, or motion to suppress in progress in that court or another court."  (§ 1050, subd. (g)(2).[3])  In addition, although subdivision (g)(2) states that "[*a*] *continuance* under this paragraph shall be limited to a maximum of 10 additional court days" (*ibid.,* italics added), it says nothing about whether multiple continuances are permitted.  Subdivision (g)(3), by contrast, states that "[o]nly one continuance per case may be granted to the people under this subdivision for cases involving" three of the six offenses listed in subdivision (g)(2).[4]

By prohibiting multiple continuances only in cases involving three of the six offenses listed in subdivision (g)(2) of section 1050, subdivision (g)(3) plainly indicates that multiple continuances are permitted in cases involving the three offenses listed in subdivision (g)(2) but not in subdivision (g)(3).  As the Supreme Court has observed, "the

---

[3]  Section 1050, subdivision (g)(2) provides in full:  "For purposes of this section, 'good cause' includes, but is not limited to, those cases involving murder, as defined in subdivision (a) of Section 187, allegations that stalking, as defined in Section 646.9, a violation of one or more of the sections specified in subdivision (a) of Section 11165.1 or Section 11165.6, or domestic violence as defined in Section 13700, or a case being handled in the Career Criminal Prosecution Program pursuant to Sections 999b through 999h, or a hate crime, as defined in Title 11.6 (commencing with Section 422.6) of Part 1, has occurred and the prosecuting attorney assigned to the case has another trial, preliminary hearing, or motion to suppress in progress in that court or another court. A continuance under this paragraph shall be limited to a maximum of 10 additional court days."

[4]  Section 1050, subdivision (g)(3) provides in full:  "Only one continuance per case may be granted to the people under this subdivision for cases involving stalking, hate crimes, or cases handled under the Career Criminal Prosecution Program.  Any continuance granted to the people in a case involving stalking or handled under the Career Criminal Prosecution Program shall be for the shortest time possible, not to exceed 10 court days."

11

explicit mention of some things in a text may imply other matters not similarly addressed are excluded." (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514.) This is particularly true where, as in subdivision (g)(3) of section 1050, the Legislature has included an item in one list in a statute but excluded it from a closely related list. (*Barron v. Superior Court* (2023) 90 Cal.App.5th 628, 638; see also *People v. Buycks* (2018) 5 Cal.5th 857, 880 [" 'When the Legislature "has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded." ' "].) As a consequence, subdivision (g) of section 1050 is naturally read to prohibit multiple continuances in cases involving offenses listed in subdivision (g)(3) but to permit them in cases involving offenses included only in subdivision (g)(2).

Indeed, as the Attorney General points out, any other interpretation would render section 1050, subdivision (g)(3)'s list of offenses superfluous. If multiple continuances were implicitly prohibited in all cases involving offenses listed in subdivision (g)(2), there would be no need for subdivision (g)(3) to expressly prohibit multiple continuances in cases involving only some of those offenses. Such an interpretation should be avoided: "Well-established canons of statutory construction preclude a construction which renders a part of a statute meaningless or inoperative." (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 274.) As a consequence, subdivision (g) of section 1050 should be interpreted to permit multiple continuances in cases involving offenses that are listed in subdivision (g)(2) but not listed in subdivision (g)(3).

This case involves such an offense. Subdivision (g)(2) lists six offenses. One is "murder, as defined in subdivision (a) of Section 187." (§ 1050, subd. (g)(2).) The other five are "[1] stalking, as defined in Section 646.9, [2] a violation of one or more of the sections specified in subdivision (a) of Section 11165.1 or Section 11165.6, or [3] domestic violence as defined in Section 13700, or [4] a case being handled under the Career Criminal Prosecution Program pursuant to Sections 999b through 999h, or [5] a hate crime, as defined in Title 11.6 (commencing with Section 422.6 of Part 1." (*Ibid.*)

12

Subdivision (g)(3) applies only to "stalking, hate crimes, or cases under the Career Criminal Prosecution Program." (*Id.*, subd. (g)(3).) This case involves an offense listed only in subdivision (g)(2): "a violation . . . Section 11165.6," which address " 'child abuse or neglect,' " including "the endangering of the person or health of a child." (§ 11165.6.) As a consequence, subdivision (g) permits multiple continuances in cases involving child abuse, the offense alleged here.

Nor does Torres offer any plausible alternative reading of the language of subdivision (g) of section 1050. She makes no attempt to explain how subdivision (g)(2) can be interpreted to prohibit multiple continuances in cases involving child abuse or other offenses not listed in subdivision (g)(3). In addition, while Torres assert that her proposed construction of section 1050 would "[n]ot necessarily" render subdivision (g)(3) a nullity, she fails to explain how subdivision (g)(3)'s list of offenses would have any meaningful operation under her interpretation. She merely asserts that subdivision (g)(3)'s express prohibition against multiple continuances might have been the product of "awkward draftsmanship," been inserted "for emphasis," or reflected a "slight narrowing of the understanding given the statute." But Torres fails to offer any precedent or other justification for interpreting a statutory provision to be meaningless on such grounds.

We therefore conclude that subdivision (g) should be interpreted according to its plain language to permit multiple continuances for prosecutorial scheduling conflicts in cases involving offenses such as child abuse that are listed in section 1050, subdivision (g)(2) but not subdivision (g)(3).

b. *Burgos*

The First District, Division Five, reached a similar conclusion in the leading case interpreting subdivision (g) of section 1050, *Burgos v. Superior Court* (2012) 206 Cal.App.4th 817 (*Burgos*). In that case, the First District considered whether multiple continuances may be granted in a case involving murder (*id.* at p. 821), one of the offenses listed in section 1050, subdivision (g)(2) but not subdivision (g)(3). The Court

13

of Appeal began by observing that "[s]ection 1050(g)(2) must be construed in light of section 1050(g)(3)." (*Burgos*, at p. 837.) Then, treating subdivision (g)(3) of section 1050 as effectively creating an exception for cases involving certain offenses listed in subdivision (g)(2), *Burgos* applied the "well-established maxim of statutory interpretation that 'the presence of express exceptions ordinarily implies that additional exceptions are not contemplated.' " *(Burgos*, at p. 837, quoting *People v. Standish* (2006) 38 Cal.4th 858, 870.) "[T]he clear implication from subdivision (g)(3)." *Burgos* observed, "is that, except in the three types of cases identified therein (stalking, hate crimes, and Career Criminal Prosecution Program cases), the People may obtain more than one continuance per case under section 1050(g)(2)." (*Ibid.*) In addition, noting that the legislative history of the 2002 amendment to section 1050, subdivision (g)(3) is "[c]onsistent with this plain language interpretation of the statute" (*Burgos,* at p. 837, fn. 16), *Burgos* concluded that "the enactment of section 1050(g)(3) demonstrates that the Legislature considered whether multiple section 1050(g)(2) continuances should be permitted and chose to permit multiple continuances in murder and domestic violence cases but not in the other three types of cases specified in section 1050(g)(2)." (*Id.* at p. 837.)

Although *Burgos* did not mention child abuse, its reasoning applies equally to cases involving this offense. In addition to offenses involving murder and domestic violence, subdivision (g)(2) of section 1050 applies to cases involving allegations of a "violation of one or more of the sections specified in subdivision (a) of Section 11165.1 or Section 11165.6." (§ 1050, subd. (g)(2).) Those sections deal, respectively, with " '[s]exual assault' " (§ 11165.1, subd. (a)) and " 'child abuse or neglect,' " which is defined to mean "physical injury or death inflicted by other than accidental means upon a child by another person" (§ 11165.6)—exactly what Torres was charged with allowing Apollo to suffer. Moreover, none of these offenses is among the offenses listed in subdivision (g)(3) of section 1050. Consequently, under *Burgos*' reasoning, subdivision

14

(g)(2) should be interpreted to permit multiple continuances in cases involving child abuse and sexual assault, as well as murder and domestic violence.

### c. Legislative History

Torres argues that *Burgos* was wrongly decided and should be rejected because its interpretation of subdivision (g) of section 1050 is "entirely at odds" with the subdivision's legislative history. We disagree.

First, legislative history does not take precedence over plain language. "Although legislative history often can help interpret an ambiguous statute, it cannot change the plain meaning of clear language." (*In re Steele* (2004) 32 Cal.4th 682, 694.) "Only when the language of a statute is susceptible to more than one reasonable construction is it appropriate to turn to extrinsic aids, including the legislative history of the measure, to ascertain its meaning." (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1055.) Here, as shown above, Torres has failed to offer a reasonable alternative construction of the text of subdivision (g)(2) of section 1050. As a consequence, in this case, we must follow the text of the statute and should not resort to legislative history. (See, e.g., *Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 269.)

Second, even if we were to consider the legislative history, it would not help Torres. To the contrary, as *Burgos* recognized, the legislative history contradicts her interpretation. (See *Burgos*, *supra*, 206 Cal.App.4th at p. 837, fn. 16.)

In 2002, an Assembly Committee noted that section 1050, subdivision (g) permitted continuances due to prosecutorial scheduling conflicts in cases involving the four offenses then listed in subdivision (g)(2). (Assem. Com. on Public Safety, Rep. on A.B. 2653 (2001-2002 Reg. Sess.), as introduced Feb. 22, 2002, p. 4 ["the court shall continue a court date in a case involving *murder, stalking, physical or sexual child abuse, or a case handled under the Career Criminal Prosecution Program* if the prosecutor for the case has been assigned to another court on another matter" (italics added)].) The report also noted that existing law permitted only one continuance in cases involving the

15

two offenses then listed in section 1050, subdivision (g)(3). (*Ibid*. ["only one continuance may be granted to the people *in stalking cases or cases under the Career Criminal Prosecution Program*" (italics added)].) Thus, the 2002 report implicitly recognized that the prohibition against multiple continuances applies only in cases involving the two offenses listed in subdivision (g)(3) of section 1050 and that multiple continuances are permitted in cases involving the offenses listed in subdivision(g)(2) but not subdivision (g)(3).

Torres does not mention the 2002 Assembly Committee report. Instead, she relies on earlier materials. For example, she points to 1987 Legislative Counsel's digest for the legislation adding what is now subdivision (g)(2) of section 1050, which stated that "[t]he bill would limit continuance in these specific cases to a maximum of 10 additional court days." (Legis. Counsel's Dig., Assem. Bill. No. 2452 (1987-1988 Sess.), 4 Stats. 1987, p. 137.) She also points to a 1998 Assembly Committee report stating that subdivision (g) "only allows for a brief continuance which cannot exceed 10 court days" and that there would be "little prejudice to the defendant from a delay of 10 additional court days." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1754 (1997-1998 Reg. Sess.), as introduced Feb. 4, 1998, p. 2.) A 1999 committee report quoted by Torres contains similar language. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 501 (1999-2000 Reg. Sess.), as introduced Feb. 18, 1999, pp. 2-3 ["Penal Code Section 1050(g) . . . allows a brief continuance which cannot exceed 1 court days," and "[t]here is little prejudice from to the defendant from a delay of 10 additional court days"].)

None of these materials, however, directly addresses whether multiple continuances are permitted, and all were issued before the Legislature added subdivision (g)(3)'s express prohibition against multiple continuances. That prohibition was enacted in 1999, after the 1987 and 1998 legislative histories cited by Torres. (Stats. 1999, ch. 382, § 2, p. 266; Stats. 1999, ch. 580, § 2, p. 4110.) In addition, the 1999 committee report quoted by Torres concerns Assembly Bill No. 501 (Assem Bill

16

No. 501) as it was introduced in February 1999. (See Assem. Com. on Public Safety, Rep. on A.B. 501 (1999-2000 Reg. Sess.), as introduced Feb. 18, 1999, p. 1 [noting Mar. 23, 1999 hearing].) The provision prohibiting multiple continuances that became subdivision (g)(3) was not added to Assem Bill No. 501 until June 1999, roughly three months later. (Assem. Bill No. 501 (1999-2000 Reg. Sess.) § 2, as amended in Senate June 15, 1995; see *Burgos*, *supra*, 206 Cal.App.4th at p. 836, fn. 14.) Consequently, as *Burgos* recognized, while read in isolation the material cited by Torres might be construed to suggest subdivision (g)(2) of section 1050 permits only one 10-day continuance, it sheds no light on how subdivision (g)(s) should be interpreted in light of the express but limited prohibition against multiple continuances in subdivision (g)(3).

Even more important, when the legislative history of Assembly Bill No. 501 addressed that question, it recognized that the prohibition applies only to the offenses included in subdivision (g)(3) of section 1050. After Assembly Bill No. 501 was amended to add the provision expressly prohibiting multiple continuances now in section 1050, subdivision (g)(3), the Senate report discussing the amended bill implicitly recognized that multiple continuances were prohibited only for the offense expressly included in the added provision. The report noted that "[e]xisting law provides" that in murder, sexual assault, child abuse, and domestic violence cases, a court "may find 'good cause' to continue the trial or hearing for up to ten days" where the prosecutor is unavailable due to another trial or similar matter in progress (Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Assem. Bill No. 501 (1999-2000 Reg. Sess.), as amended June 15, 1999, p. 2) and that the proposed bill would allow courts similarly to find good cause to continue cases involving career criminal prosecution "for up to 10 court days." (*Id*. at p. 3.) The report then adds that "[o]nly one continuance per case may be granted *for cases handled under the Career Criminal Prosecution Program*," without any mention of a similar limitation on murder, assault, child abuse, and domestic

17

violence cases (*ibid*.), thereby implying that multiple continuances are permitted in cases involving the latter types of offenses.

In short, even if legislative history could be consulted despite the plain language of section 1050, it would not support Torres' interpretation.

### d. Absurdity

Finally, Torres argues that subdivision (g)(2) of section 1050 cannot be interpreted to permit multiple continuances in cases involving offenses omitted from subdivision (g)(3)'s list because such an interpretation would be absurd. *Burgos* already has answered this argument. *Burgos* reasoned that "applying the clear language of the statute does not produce absurd results" because the Legislature may have concluded that murder cases are of "sufficient importance and complexity" that multiple continuances should be permitted to allow the prosecutor originally assigned to a case to try the case "even if it requires multiple continuances under section 1050(g)(2) to do so." (*Burgos*, *supra*, 206 Cal.App.4th at p. 840.)

The same is true in sexual assault and child abuse cases. Like murder cases, sexual assault and child abuse cases are important and often complex. In addition, in sexual assault and child abuse cases, a forced change of attorney may be traumatic for the victim because in such cases prosecutors often build a rapport on the express or implied assurance that the victim will have to deal with only one prosecutor. (Assem. Com. on Public Safety, Assem. Bill No. 2452 (1987-1988 Reg. Sess.), as introduced Mar. 6, 1987, p. 3.) Because a change in attorney violates that assurance, "[o]ften the victim will refuse to deal with a new attorney, forcing a dismissal of the case which is harmful to the victim and to society." (*Id*. at p. 2.) As a consequence, there are compelling reasons to allow multiple continuances in sexual assault and child abuse cases. Torres points out that the Legislature's concerns about maintaining the rapport between victim and prosecuting attorney are absent in this case (because the victim, Apollo, is dead.) But that makes no

18

difference to the interpretation of section 1050, subdivision (g) because that provision applies on a categorical, rather than a case-by-case, basis.

We therefore conclude that section 1050, subdivision (g) permits multiple continuances in cases such as this one involving child abuse.

### 2. The Sixth Amendment

Torres argues that, even if subdivision (g)(2) permits multiple continuances, the delay resulting from the 18 continuances in this case violated her right to a speedy trial under the Sixth Amendment (as applied though the Fourteenth Amendment) to the United States Constitution.[5]  Here again, we disagree.

Although the Sixth Amendment states that "the accused shall enjoy the right to a speedy . . . trial," this guarantee has not been interpreted to prevent all delay.  (*Doggett v. United States* (1992) 505 U.S. 647, 651 (*Doggett*).)  Instead, in *Barker v. Wingo* (1972) 407 U.S. 514, 530 (*Barker*), the United States Supreme Court adopted a balancing test that requires consideration of four factors: "the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defense caused by the delay." (*People v. Martinez* (2000) 22 Cal.4th 750, 755.)  To trigger the *Barker* balancing test, "an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial" delay . . . ."  (*Doggett*, *supra*, 505 U.S. at pp. 651-652.)

While Torres satisfies this threshold burden and triggers the *Barker* balancing test, she fails to demonstrate any violation under that test because the delay in this case was not excessively long, the prosecutor had strong justifications for it, and Torres suffered no prejudice to her ability to defend herself.

---

[5]  Torres does not assert a violation of her right to a speedy trial under the California Constitution.

19

### b.     Length of Delay

As the Attorney General acknowledges, the delay in this case crossed the threshold between ordinary and presumptively prejudicial delay. The Sixth Amendment's speedy trial guarantee attaches when, among other things, a suspect "has been arrested and held to answer." (*United States v. Marion* (1971) 404 U.S. 307, 321.) In this case, that occurred on January 11, 2019 when Torres was arraigned and detained without bail. As trial did not begin until July 22, 2020, the delay in trial was over eighteen months. "[P]ostaccusation delay is considered presumptively prejudicial 'at least as it approaches one year.' " (*People v. Horning* (2004) 34 Cal.4th 871, 892 (*Horning*), quoting *Doggett*, *supra*, 505 U.S. at p. 652, fn. 1.) The delay in this case was therefore long enough to create a presumption of prejudice and trigger the *Barker* balancing test.

Torres asserts that the delay in this case also was "extraordinar[] by any measure" and "weighs heavily against the government. We disagree. Courts have held delays of eight years " 'extraordinary' " and five years "great." (*Doggett,* supra*, 505 U.S. at p. 658; *United States v. Shell* (9th Cir. 1992) 974 F.2d 1035, 1036.) However, where the delay was less than two years, they have held that the delay was "not excessive" and "does not seriously weigh in [defendant's] favor." (*United States v. King* (2007) 483 F.3d 969, 976; see also *United States v. Gregory* (9th Cir. 2003) 322 F.3d 1157, 1162 [22-month delay "not excessively long"]; *United States v. Clark* (11th Cir. 1996) 83 F.3d 1350, 1354 [17-month delay "not very great"]; *United States v. Beamon* (1993) 992 F.2d 1009, 1014 [delays of 17 and 20 months " 'not great' "].) Indeed, even a three-year delay is "not at the high end of the range where Speedy Trial Clause violations typically lie." (*United States v. Lonich* (9th Cir. 2022) 23 F.4th 881, 894.)

Thus, while the 18-month delay in this case is enough to trigger the *Barker* balancing test, it does not weigh heavily in favor of dismissal.

b.      Reasons for Delay

The second *Barker* factor, the reasons for delay, has long been recognized as the "focal inquiry" of the *Barker* balancing test.  (*United States v. Sears, Roebuck and Co., Inc.,* (9th Cir. 1989) 877 F.2d 734, 739, citing *United States v. Loud Hawk* (1986) 474 U.S. 302, 315.)  This factor weighs against dismissal.  There is no evidence that the prosecution "intentionally held back in its prosecution of [Torres] to gain impermissible advantage at trial" or otherwise delayed Torres's trial for an improper purpose.  (*Doggett*, *supra*, 505 U.S. at p. 656.)  Nor is there any suggestion that the prosecution acted negligently or dilatorily.  Instead, the People delayed Torres' trial for three legitimate reasons.

First, as shown above, the People sought continuances because this is a complicated and sensitive case, and the prosecutor assigned it was unavailable due to a trial in another case.  As the Legislature recognized in enacting subdivision (g)(2) of section 1050, there is a public interest in ensuring "that prosecutors assigned to certain sensitive or complicated cases remain on those cases, notwithstanding scheduling conflicts that would otherwise force a replacement prosecutor to assume responsibility for the case."  (*Burgos*, *supra*, 206 Cal.App.4th at p. 829.)  Subdivision (g)(2) of section 1050 deals with cases involving murder, child neglect or abuse, sexual assault, and hate crimes, matters that are "among the most serious of all offenses."  (Assem. Com. on Public Safety, Rep. on Assem. Bill No. 1754 (1997-1998 Reg. Sess.), as introduced Feb. 4, 1998, p. 2.)  If the People were forced to reassign such important and complicated cases to prosecutors unfamiliar with them, many of those cases may be lost.  (*Burgos*, at p. 829.)  As a consequence, allowing continuances in those cases not only avoids the inefficiency and waste of having multiple prosecutors prepare complicated cases; it also supports the public interest in bringing to justice individuals who commit murder, child abuse, sexual assault, and hate crimes.

21

Second, as the trial court recognized, even if another prosecutor had taken over this case, it would have been difficult to conduct Torres' trial and Manuel Lopez's murder trial simultaneously because the two cases overlap significantly. In particular, though Torres did not contest the point, to prove her an accessory after the fact to Apollo's murder, the prosecution still had to establish that Lopez murdered Apollo. Consequently, if Torres' trial had been conducted at the same time as Lopez's murder trial, it would have been necessary to coordinate the testimony of many witnesses, and counsel in each case would have had to monitor testimony in the other case. As the federal courts have recognized in the context of overlapping state and federal prosecutions, avoiding such burdens is a legitimate reason for delay. (See, e.g., *United States v. Myers* (9th Cir. 2019) 930 F.3d 1113, 1121 ["when the state's charges factually overlap with the federal charges, such that trying the defendant concurrently would present administrative hurdles and safety concerns, a delay may be justified"].)

Third, a significant portion of the delay in Torres's trial was attributable to the COVID-19 pandemic. Starting in March 2020, the trial court granted continuances because of emergency orders limiting the use of courtrooms. These delays were not "the fault of the prosecution or [trial] court," but rather of the pandemic (*Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1128) and were "unquestionably . . . justified" by the risks to the health and safety of court personnel, jurors, attorneys, and the defendant. (*Stanley v. Superior Court* (2020) 50 Cal.App.5th 164, 170.)

Torres does not dispute that the delay attributable to the COVID-19 pandemic was justified. Instead, she contends that, absent the continuances due to Lopez's trial, her trial would have been completed before the pandemic. Torres also contends that the Attorney General has exaggerated the difficulties in reassigning this case to another prosecutor and that the only complicated evidence presented at her trial, the DNA evidence, was uncontested. In fact, however, this was far from a simple case. In addition to concerning

a highly sensitive subject, it involved thirty proposed witnesses, including not only a DNA expert, but also the medical examiner, eight doctors, six police officers, social workers, a paramedic, friends and relatives of the defendant, and at least one child.  It took three full days to select the jury, and another thirteen days to present the testimony.  Contrary to Torres' assertions, this was the sort of complicated and sensitive case in which the People should not be forced to hand the trial to a prosecutor with no prior involvement in the case.

In short, there were multiple justifications for the delay in Torres's trial, and the second *Barker* factor weighs strongly against dismissal.

### c.      Assertion of the Right to a Speed Trial

The third *Barker* factor is the defendant's assertion of the right to a speedy trial.  This factor weighs in favor of dismissal because Torres first asserted her right to a speedy trial in October 2019 just before expiration of the 60-day period for trial under section 1382 and repeatedly renewed that objection over the next nine months.

### d.      Prejudice

The fourth *Barker* factor, prejudice, weighs against finding a speedy trial violation.  Prejudice under the Sixth Amendment includes " 'oppressive pretrial incarceration,' 'anxiety and concern of the accused' and 'the possibility that the [accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." (*Doggett*, *supra*, 505 U.S. at p. 654.)  "Of these forms of prejudice, 'the most serious is the last, because the inability of a defendant to adequately prepare his case skews the fairness of the entire system.' " (*Ibid*.)  Torres has failed to show this sort of prejudice, and the other forms of prejudice that she asserts do not justify dismissal.

Torres has not identified any "particularized prejudice." (*Horning*, *supra*, 34 Cal.4th at p. 894.)  While the 18-month delay in this case is enough to satisfy the *Barker* test's threshold requirement and create a presumption of prejudice, even a 22-month delay "is not long enough to excuse [a defendant] from demonstrating actual prejudice to

23

prevail" on a speedy trial claim. (*Gregory*, *supra*, 322 F.3d at p. 1163; see also *Beamon*, *supra*, 992 F.2d at p. 1014 [17- and 20-month delay insufficient].) In addition, Torres has not shown that any relevant documents were lost, any witnesses died, or evidence otherwise became unavailable. As a consequence, Torres has not shown any impairment of her ability to defend herself and therefore has failed to show the most serious type of prejudice.

Torres instead points to the fact that she was incarcerated for the 18 months prior to her trial and to the resulting anxiety and uncertainty that she suffered. Courts, however, repeatedly have found only minimal prejudice from incarceration or delay for such a period. (See, e.g., *Barker*, *supra*, 407 U.S. at p. 534 [finding "prejudice was minimal" from "spend[ing] 10 months in jail before trial"]; *United States v. Brown* (9th Cir. 2020) 828 F.Appx. 366, 371 [finding only "minimal prejudice from the 14-month incarceration"].) Pointing to evidence attached to various motions submitted at trial and to her probation report, Torres asserts that she was especially vulnerable to anxiety and stress based on her mental health. But she did not present any of this evidence in objecting to the delay in her trial, and the prosecution had no chance to present responsive evidence on this issue. We therefore decline to consider it.

Accordingly, we find no evidence that Torres suffered significant prejudice from the delay before trial, and the fourth *Barker* factor weighs against dismissal.

\* \* \*

In sum, although Torres promptly and vigorously asserted her speedy trial rights, the delay in her trial was not excessively long, there were legitimate and reasonable justifications for the delay, Torres' ability to defend herself was not impaired, and the other prejudice that she suffered was not severe. We therefore conclude that the *Barker* factors weigh against finding a violation and there was no constitutional violation.

24

B.    *The Unanimity Instruction*

Torres requested a unanimity instruction on count 1, the child abuse charge, which would have required that all jurors agree on the acts establishing the offense.  The trial court denied this request because the People prosecuted this count on a continuing course of conduct theory for which unanimous agreement on particular actions is not required, but decided *sua sponte* to give a unanimity instruction on count 3, the perjury charge.  On appeal, Torres argues that the trial court erred in denying a unanimity instruction on count 1 and in not *sua sponte* giving a unanimity instruction on count 2, the accessory-to-murder charge.  The Attorney General responds that the trial court correctly denied a unanimity instruction concerning the child abuse count and that its failure to give an instruction on the accessory-to-murder count was harmless.  As explained below, we agree on both points.

1.    The Unanimity Requirement

The right to a jury trial guaranteed by the California Constitution requires that guilty verdicts "be unanimous."  (*People v. Collins* (1976) 17 Cal.3d 687, 693.)  Consequently, "when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.  [Citations.]"  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).)  Accordingly, when the prosecution presents evidence of multiple acts that each constitute a discrete crime, the jury should be instructed that all jurors must agree on what acts occurred.  (See 2 CALCRIM No. 3500 (2022 ed.) ["The People have presented evidence of more than one act to prove that the defendant committed this offense.  You must not find the defendant guilty unless you agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."].)

However, jurors are not required to agree on every fact concerning a crime (see, e.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1026), and "there is no unanimity

requirement as to the theory of guilt." (*People v. Santamaria* (1994) 8 Cal.4th 903, 919.) A jury need only "agree unanimously the defendant is guilty of a *specific* crime. [Citation]." (*Russo*, *supra*, 25 Cal.4th at p. 1132.) In particular, jurors are not required to agree on every fact concerning an offense that "consists of a continuous course of conduct." (*People v. Diedrich* (1982) 31 Cal.3d 263, 282 (*Diedrich*).) To the contrary, "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Russo*, *supra*, 25 Cal.4th at p. 1132.)

Consequently, under the "continuous conduct" exception, no unanimity instruction is required for offenses such as conspiracy, torture, harboring a felon, pandering, spousal abuse, and, most pertinently, child abuse that are prosecuted on a continuous course of conduct theory. (See *People v. Jennings* (2010) 50 Cal.4th 616, 680 (*Jennings*) [torture]; *Russo*, *supra*, 25 Cal.4th at pp. 1133-1136 [conspiracy]; *People v. Napoles* (2002) 104 Cal.App.4th 108, 115-119 [child abuse] (*Napoles*); *People v. Gunn* (1987) 197 Cal.App.3d 408, 414-416 (*Gunn*) [harboring felon]; *People v. Thompson* (1984) 160 Cal.App.3d 220, 224-226 [spousal abuse]; *People v. White* (1979) 89 Cal.App.3d 143, 151 [pandering].)

### 2. The Child Abuse Count

The child abuse count in this case falls squarely within the "continuous conduct" exception. Although a single act may constitute child abuse, child abuse charges under § 273a—the provision charged—"more commonly . . . cover[] repetitive or continuous conduct." (*People v. Ewing* (1977) 72 Cal.App.3d 714, 717 (*Ewing*).) Consequently, courts have long recognized that unanimity instructions are not required in a child abuse case prosecuted on a continuous course of conduct theory. (*Napoles*, *supra*, 104 Cal.App.4th at pp. 114-117; *People v. Vargas* (1988) 204 Cal.App.3d 1455, 1460-1467; *Ewing*, *supra*, 72 Cal.App.3d at p. 717; see also *Diedrich*, *supra*, 31 Cal.3d at p. 282

26

[noting unanimity instruction not required in child abuse cases alleging a continuous course of conduct].)

Here, far from being charged with discrete instances of abuse, Torres was charged with willfully causing or permitting harm to Apollo over a period of nearly one year, "between February 1, 2015 and January 16, 2016." In addition, during closing argument, the prosecutor did not ask the jury to convict Torres based on any specific act of abuse. To the contrary, the prosecutor told the jury that "I'm not talking about one event" and, indeed, admitted that he did not know "what role the defendant actually played in the abuse" of Apollo. The prosecutor argued that Torres engaged in a "systematic[,] continuous course of conduct" designed "to hide what was taking place with her son" by offering innocent explanations for his injuries, neglecting to seek treatment for injuries, taking him to different doctors, and failing to return follow-up requests so that no one would have a full picture of the abuse that he was suffering. This is exactly the sort of continuous course of conduct in which no one act constitutes the crime and an instruction requiring unanimous agreement on particular acts is inappropriate.

Torres argues that the evidence presented at trial "disclosed several discrete and disparate episodes (or courses of conduct)" and that the trial court should have given the jury a unanimity instruction to ensure that they agreed on the same course of conduct. In the trial court, however, Torres did not argue that there were distinct and separate courses of conduct at trial, and she is unable to point to anything in the closing arguments suggesting any courses of conduct besides the one asserted by the prosecutor. Instead, Torres asserts that individual jurors might have found her grossly negligent "in connection with the two arm and leg fractures that Apollo suffered" in the summer of 2015 or with the "signs of sexual abuse leading up" to Apollo's death in January 2016. Absent evidence that jurors were asked to find such distinct courses of conduct, or explanation why they would have done so on their own initiative, this argument provides no basis for requiring a unanimity instruction.

27

Torres also tries to distinguish decisions applying the continuous conduct exception on the ground that the acts of abuse in those cases took place over a shorter period of time. While that is true, the events at issue in this case took place from May 2015 to January 2016, which is a period of only eight months, and the evidence presented by the prosecution showed that Apollo suffered a succession of injuries, major as well as minor, during this period. Moreover, Torres fails to explain why the length of the course of conduct is material here. While courts have recognized that no unanimity instruction is required " 'when the acts are so closely connected in time as to form part of one transaction' " (*Jennings*, *supra*, 50 Cal.4th at p. 679), they also have held that no instruction is required when a statute " 'contemplates a continuous course of conduct over a period of time.' " (*Ibid.*, italics added.) Under this latter theory, which is the one applicable here, it is not necessary that the conduct occur over a short time frame.

Finally, Torres contends that the evidence of abuse in this case is more "equivocal" than the evidence in prior cases applying the continuous conduct exception. Torres, however, fails to explain how this distinction makes any difference. In deciding whether to give a unanimity instruction, a trial court does not ask whether the evidence is ambiguous and the jury is likely to disagree on particular facts. It asks whether there is a risk that the jury may "divide on two discrete crimes and not agree on any particular crime." (*Russo*, *supra*, 25 Cal.4th at p. 1135.) Torres has not shown any risk here that the jury would divide on two discrete crimes and therefore has not shown need for a unanimity instruction on the child abuse charge.

### 3. The Accessory-to-Murder Count

Torres also argues that the trial court "erred by refusing to give a unanimity instruction as to the accessory charge" (boldface & capitalization omitted) because the "prosecutor cited several distinct and disparate actions by [Torres] as proof that she intentionally tried to help Manual Lopez avoid prosecution for the murder of Apollo."

28

The Attorney General concedes error on this point but argues that the error was harmless. We agree in both respects.

In general, "being an accessory after the fact is not the kind of offense which, in itself, consists of a continuous course of conduct." (*People v. Metheney* (1984) 154 Cal.App.3d 555, 562.) This is especially so where acts, "separated by several months, were not committed so closely together that they formed part of one and the same transaction." (*Gunn, supra*, 197 Cal.App.3d at p. 413.) Here, Torres was charged as an accessory to murder because she helped Lopez avoid conviction for murdering Apollo by cleaning him up and thereby destroying physical evidence before the police arrived on the day of his death, by providing false and misleading information to the police during the subsequent investigation, and by giving false testimony at Lopez's preliminary examination in March 2018. As Torres could have been found an accessory for any of these actions, there was "a risk the jury may divide on two discrete crimes and not agree on any particular crime," and a unanimity instruction should have been given. (*Russo, supra*, 25 Cal.4th at p. 1135.)

However, Torres was not prejudiced by the trial court's failure to give a unanimity instruction. Although there is a split over the harmless error standard in unanimity instruction cases (see *People v. Hernandez* (2013) 217 Cal.App.4th 559, 576; *People v. Matute* (2002) 1003 Cal.App.4th 1437, 1448), we need not take a position on this split because the error in his case was harmless under the more stringent test under *Chapman v. California* (1967) 386 U.S. 18. As defense counsel acknowledged in closing, the accessory-to-murder count overlaps with the perjury count because the prosecutor argued that Torres made false statements under oath during the preliminary examination in Lopez's case to help Lopez avoid responsibility for Apollo's murder, and the perjury charge was based the same false testimony. As the jury received a unanimity instruction on the perjury count and found her guilty on that count, it is clear beyond a reasonable doubt that the jury also would have found Torres guilty on the accessory count based on

29

her false statements during the preliminary examination even if it had received a unanimity instruction on that count. As a consequence, the failure to give the unanimity instruction for the accessory count was harmless. (*In re Ferrell* (2023) 14 Cal.5th 593, 602 (*Ferrell*) ["Harmlessness can be shown ' "if the jury verdict on other points effective embraces" ' the valid theory. . . ."].)

Torres tries to posit a scenario in which the jury could have convicted her of perjury during Lopez's preliminary examination without finding that she intended to help him escape punishment and was guilty on the accessory count. While Torres concedes that five of the ten false statements that she made at the preliminary examination exculpated Lopez, she contends that the other five statements might have been intended merely to minimize her responsibility for Apollo's injuries and "make herself seem less negligent as a parent." At trial however, Torres did not argue that some of her statements at the preliminary examination were intended to make herself, not Lopez, look better; she simply denied that she intended to help Lopez. Moreover, in convicting Torres of perjury, the jury necessarily found that Torres' false statements at the preliminary examination were material and, thus, might have exonerated Lopez. We do not see how a reasonable jury could have found that Torres, under oath and subject to penalty of perjury, knowingly made false statements exonerating Lopez without also finding that she intended the statements to help him. Accordingly, Torres' argument does not affect our conclusion that the failure to give a unanimity instruction on the accessory count was harmless. (See *Ferrell*, *supra*, 14 Cal.5th at p. 603; *In re Lopez* (2023) 14 Cal.5th 562, 591.)

### C. *The Statute of Limitations Instruction*

Torres argues that her defense counsel rendered ineffective assistance of counsel by failing to request an instruction concerning the statute of limitations on the child abuse count. This argument is somewhat extended. According to Torres, because the relevant limitations period is three years and she was not prosecuted until an arrest warrant issued

on January 10, 2019, the People had to show that she committed child abuse in the brief window between January 10, 2016 and January 16, 2016, when Apollo died.  Torres therefore contends that her trial counsel should have requested an instruction requiring the jury to unanimously agree that some act or omission constituting child abuse occurred during this window. We are not persuaded.

To establish ineffective assistance of counsel, a defendant "must show that counsel's performance was deficient, and that the deficiency prejudiced the defendant." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521; *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)  "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 104.)  Moreover, in evaluating whether counsel's performance was deficient, a court "must apply a 'strong presumption' that counsel's performance was within the 'wide range' of reasonable professional assistance." (*Ibid.*)  Finally, to establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

Torres has not established that trial counsel was deficient in not requesting an instruction concerning the statute of limitations.  Indeed, Torres' ineffectiveness argument fails for much the same reason as her unanimity argument concerning the child abuse count fails:  That count was based on a continuing course of conduct.  Where a continuing failure to perform a duty is charged, " '[t]he offense continues as long as the duty persists, and there is a failure to perform that duty.' " (*Wright v. Superior Court* (1997) 15 Cal.4th 521, 525-526), and "the limitations period does not commence as to continuing offenses until the entire course of conduct is complete." (*People v. Keehley* (1987) 193 Cal.App.3d 1381, 1385.)  As a consequence, the statute of limitations on the child abuse count did not begin to run until concealment of Lopez's abuse of Apollo ceased, which did not occur until Apollo's death on January 16, 2016 at the earliest.

31

Indeed, during Lopez's preliminary examination Torres admitted that only days before Apollo's death she decided not to take him to the doctor to treat bruising in his genital area because she was afraid that the doctor would suspect child abuse. As a consequence, Torres' continuous course of child abuse plainly continued past January 10, 2016, and the child abuse charge against her was not barred by the statute of limitations.

As "[t]he Sixth Amendment does not require counsel to ' "waste time with frivolous or futile motions" ' " (*People v. Memro* (1995) 11 Cal.4th 786, 834), Torres' trial counsel was not deficient in failing to seek a unanimity instruction concerning the statute of limitations.

D.     *The Length of Probation*

Torres argues that the five years of probation given for her accessory and perjury convictions should be reduced to two years. The Attorney General concedes that these terms should be reduced, and we accept that concession. Effective January 1, 2021, the Legislature amended section 1203.1, subdivision (a) to limit the maximum duration of probation in most felony cases to two years. (Stats. 2020, ch. 328, § 2.) None of the exceptions to this general rule apply to the accessory and perjury counts. (See § 1203.1, subd. (*l*).[6]) Moreover, courts have been unanimous in holding that amended section 1203.1, subdivision (a) "applies retroactively to defendants who were serving a term of probation when the legislation became effective on January 1, 2021 . . . ." (*People v. Faial* (2022) 75 Cal.App.5th 738, 743 [collecting cases], review granted May 18, 2022, S273840; accord *People v. Czirban* (2021) 67 Cal.App.5th 1073, 1095.) Accordingly, the probation terms on counts 2 and 3 should be reduced from five years to two years.

---

[6] By contrast, Torres' child abuse conviction is subject to the exception for offenses "that include specific probation lengths" (§ 1203.1, subd. (*l*)(1)) because section 273a requires a minimum of 48 months' probation. (§ 273a, subd. (c)(1).)

E.     *Probation Costs*

Torres argues that the order requiring her to pay for the costs of probation should be vacated.  Here again, the Attorney General concedes that Torres is correct, and we accept the concession.  The Legislature has rendered "unenforceable and uncollectible" any portion of certain enumerated fees, including the probation supervision fee, unpaid as of July 1, 2021.  (§ 1465.9, subd. (a).)  We therefore vacate any portion of the criminal justice administration fee that remained unpaid as of July 1, 2021.  (See *People v. Greeley* (2021) 70 Cal.App.5th 609, 626-627.)

F.     *Suspension of Sentence*

Finally, Torres contends that the abstract of judgment should be amended to reflect the trial court's oral pronouncement at sentencing.  Specifically, Torres argues that the trial court stated, on the record, "that *imposition* of sentence was suspended while [Torres] was on probation," whereas the abstract of judgment "show[s] that the court suspended imposition *and* suspended execution of judgment."  Torres is correct that the abstract of judgment needs to be corrected.  However, the record shows that the trial court intended to suspend execution, not imposition, of Torres' sentence.

At sentencing, the trial court did not just suspend imposition of sentence.  It sentenced Torres to "seven years and eight months" in state prison and awarded presentence credits.  Then, the court stated that "imposition of sentence is suspended" and granted formal probation for five years.  The court, however, also stated that "[i]t would be the Court's intention to make sure that there is enough balance of a suspended state prison sentence that if Ms. Torres does not comply with the terms and conditions of her probation, that she will go to state prison."  These two statements are contradictory.  The versions of the abstract of judgment in the record—there are three—do not resolve this contradiction.  Instead, they indicate that the court suspended execution *and* imposition of sentence.

33

The rendition of judgment is an oral pronouncement.  (*People v. Mesa* (1975) 14 Cal.3d 466, 471.)  As a consequence, "[w]here there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls" (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385), and appellate courts may "order[] correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  In addition, appellate courts may correct a sentence if a trial court's oral pronouncement does not accurately state its intention.  (*People v. Menius* (1994) 25 Cal.App.4th 1290, 1294 [obvious inadvertent misstatement by trial court in referring to wrong subdivision of statute corrected]; *People v. Schultz* (1965) 238 Cal.App.2d 804, 808 [clerical error corrected where trial court misspoke].)

Here, although the trial court stated that *imposition* of sentence was suspended, its clear intention was to suspend *execution* of the sentence.  The court expressly stated that its intention that Torres would go to prison for the balance of her sentence if she violated the conditions of her probation, which would occur only if the sentence was imposed and its execution suspended.  (See *People v. Howard* (1997) 16 Cal.4th 1081, 1094 [discussing differences between suspended imposition and suspended execution types of probation].)  As a consequence, we conclude that the trial court intended to suspend the execution of Torres' sentence and that the abstract of judgment should be modified to state that execution, not imposition, of the sentence is suspended.

### III.  Disposition

The terms of probation for the accessory-to-murder and perjury convictions are reduced to two years.  Any portion of the probation supervision fee that remained unpaid as of July 1, 2021, is vacated.  In addition, the abstract of judgment is modified to reflect that execution, not imposition, of sentence is suspended.  As thus modified, the judgment is affirmed.

34

_____
BROMBERG, J.

WE CONCUR:

_____
GREENWOOD, P.J.

_____
GROVER, J.

*The People v. Torres*
H048742